FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 NOV -9 P 3: 25

CLERK'S OFFICE
AT GREENBELT
BY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

LISA WASHINGTON,

  Plaintiff,

v.

SYLVIA MATHEWS BURWELL,

  Defendant.

Case No.: GJH-16-3638

## MEMORANDUM OPINION

Plaintiff Lisa Washington brings this *pro se* action against Defendant Sylvia Mathews Burwell, former Secretary of the United States Department of Health and Human Services ("HHS"), alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. Now pending before the Court is Defendant's Motion to Dismiss, or alternatively, Motion for Summary Judgment. ECF No. 9. No hearing is necessary. Loc. R. 105.6 (D. Md. 2016). For the following reasons, Defendant's Motion, construed as a Motion for Summary Judgment, is granted.

### I.   BACKGROUND[1]

Plaintiff was hired by the National Institute of Health ("NIH") as a perioperative nurse in the Clinical Center on November 9, 2009. ECF No. 1 ¶ 7. Plaintiff's position was established under the requirements of 42 U.S.C. § 209(f), separate from the civil service laws and federal GS payment scale. *Id.* Both Plaintiff, who is black, and Karen Holcomb, who is white, were hired by Operating Room Nurse Coordinator Michael Borostovik to the same position on the same day.

---

[1] Unless otherwise indicated, all facts are taken from Plaintiff's Complaint and assumed to be true.

1

*Id.* ¶ 8. Prior to being hired by NIH, Plaintiff had two years of operating room nurse experience and seventeen years of operating room technician experience. *Id.* ¶ 10. Comparatively, Holcomb had four years of operating room nurse experience and no operating room technician experience. *Id.* In establishing starting salaries for both Plaintiff and Holcomb, NIH calculated each nurse's existing base salary immediately prior to their offers of employment. NIH determined that Plaintiff's pre-offer salary was $63,544 and Holcomb's pre-offer salary was $87,360. *Id.* ¶¶ 9, 13. NIH offered Plaintiff a starting salary of $66,721, which represented a 5% increase over her calculated pre-offer salary, and offered Holcomb a starting salary of $78,000, along with a $10,000 signing bonus. *Id.* ¶¶ 9, 22.

Plaintiff alleges that her calculated pre-offer salary did not account for her true wages earned at that time, that her starting salary did not reflect her seventeen years of operating room technician experience, and that Holcomb's pre-offer salary was inflated because it did not include deductions for health benefits. *Id.* ¶¶ 13, 16. Based on this pay discrepancy, Plaintiff alleges that she was "not paid equal pay for equal work" as a result of a discriminatory pay scale. *Id.* ¶¶ 21, 22. In addition, Plaintiff alleges that notwithstanding her "Exceptional" performance evaluations in 2010 and 2011 and her performance of technically-difficult operating room tasks, Susan Marcotte, Plaintiff's second-line supervisor, selected Holcomb over Plaintiff for temporary work "details that could lead to promotion." *Id.* ¶ 19. Plaintiff attributes both her disparate pay and promotion opportunities, as compared to Holcomb, to discrimination by NIH based on Plaintiff's race. *Id.* ¶ 25. Finally, Plaintiff alleges that after complaining about her disparate pay, her supervisor retaliated against her by failing to provide a favorable rating on her final performance evaluation upon her resignation in 2013. *Id.* ¶ 20. Specifically, she alleges that

she suffered "severe retaliation when [Borostovik] downgraded the Plaintiff [sic] final evaluation from a 4.6 in February 2013 to a blank space where lines were drawn through the space." *Id.*

Plaintiff filed a complaint of employment discrimination and harassment against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC"). On November 4, 2016, after summary judgment was granted for her employer on her EEOC complaint, Plaintiff filed a complaint in this Court. ECF No. 1.

## II. STANDARD OF REVIEW

Defendant's motion is styled as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, for summary judgment pursuant to Rule 56. A court considers only the pleadings when deciding a Rule 12(b)(6) motion. Where the parties present matters outside of the pleadings, and the court considers those matters, the court will treat the motion as one for summary judgment. *See Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Mansfield v. Kerry*, No. DKC-15-3693, 2016 WL 7383873, at *2 (D. Md. Dec. 21, 2016). As both parties rely on materials beyond Plaintiff's Complaint that were disclosed as a part of discovery during the EEOC administrative process, the Court will treat Defendant's motion as one for summary judgment. *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1987) (summary judgment should not be granted if the non-moving party has not had the opportunity to discover information that is essential to his opposition to the motion).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "This standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S.

at 247–48 (1986) (emphasis in original). Thus, "[t]he party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)) (alteration in original).

On a motion for summary judgment, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the non-moving party fails to make a sufficient showing on an essential element of her case as to which she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Therefore, on those issues on which the non-moving party has the burden of proof, it is her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## III. DISCUSSION

### A. Discrimination

Title VII states in pertinent part that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2. "A plaintiff generally may defeat summary judgment and establish a claim for race discrimination through one of two avenues of proof"—by presenting either direct or circumstantial evidence that race was a motivating factor of the employer's adverse action,

4

*Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213–14 (4th Cir.2007); or, without direct evidence, the plaintiff may proceed using the burden-shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff alleges she was discriminated against in the form of lesser pay and decreased promotion opportunities.

### i. Disparate Pay

Under the *McDonnell Douglas* approach, to establish a prima facie case of racial discrimination regarding compensation, Plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action with respect to compensation; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *See White v. BFI Waste Services, LLC*, 375 F.3d 288, 295 (4th Cir. 2004) (citing *McDonnell Douglas*, 411 U.S. at 802).

If a plaintiff establishes a prima facie case, then the burden shifts to the employer to demonstrate that it had a legitimate, non-discriminatory reason for the pay disparity. *McDonnell Douglas*, 411 U.S. at 802-805; *Kess v. Municipal Employees Credit Union of Baltimore, Inc.*, 319 F. Supp. 2d 637, 644 (D. Md. 2004). If the employer sets forth a legitimate, non-discriminatory reason for its action, the burden then shifts back to the plaintiff to show that the employer's legitimate reason is merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802–805. To demonstrate pretext, a plaintiff either must show that the employer's explanation for the employment action is "unworthy of credence," or offer evidence probative of intentional discrimination. *Tsai v. Maryland Aviation*, 306 Fed. Appx. 1, 5 (4th Cir. 2008) (citing *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004)). Conclusory allegations or statements are not sufficient to establish discrimination. *See Causey v. Balog*, 162 F.3d 795, 801–02 (4th Cir. 1998).

Here, Plaintiff alleges that Defendant offered her a reduced starting salary, as compared to Holcomb, because of her race. ECF No. 11-1 at 3.[2] Even assuming that Plaintiff can establish a prima facie case of discrimination, Plaintiff's claim fails because Defendant has demonstrated that it had a legitimate non-discriminatory reason for the pay disparity and Plaintiff cannot show that it is a pretext for discrimination.[3]

The record sets forth a clear explanation of how Defendant arrived at the starting salaries for both Plaintiff and Holcomb. Pursuant to NIH guidelines, an employee's base salary is set within a range corresponding to their position classification and depends on a variety of factors, including "the qualifications and competencies of the employee" and "the individual's current salary and benefit package." ECF No. 9-2 at 5–6. According to Defendant, the starting annual salaries for Plaintiff and Holcomb were calculated based on their pre-hire salaries, as determined from the verification of salary documents that each submitted to NIH. ECF No. 9-1 at 3. Plaintiff provided a pay statement from Suburban Hospital, indicating a base hourly rate of pay of $30.55. ECF No. 9-2 at 13. The pay statement also included a hand-written notation indicating that Plaintiff received an extra $6.00 per hour for evening shifts. *Id.* Holcomb provided a pay statement from Holy Cross Hospital, indicating a base hourly rate of pay of $42.00. *Id.* at 16.

Defendant then calculated Plaintiff and Holcomb's pre-hire salaries by multiplying each individual's base hourly rate of pay by 2,080 hours per year. ECF No. 9-1 at 3. Plaintiff's pre-hire salary did not reflect the extra $6.00 per hour for evening shifts as noted on her salary

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

[3] Arguably, Defendant's evidence of their legitimate, non-discriminatory reason for the pay disparity also calls into question whether Holcomb and Plaintiff were similar an all respects, which would undercut Plaintiff's prima facie case. Recognizing the flexibility permitted by the *McDonnell Douglas* framework, however, the Court, here, focuses the analysis on the Defendant's stated reasoning. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517 (4th Cir. 2006) (noting that the goal of *McDonnell Douglas* is "the inquiry into the elusive factual question of intentional discrimination" and that the "shifting of burdens of *McDonnell Douglas* are meant only to aid courts and litigants in arranging the presentation of evidence") (internal citations omitted).

document; however, Plaintiff's starting annual salary included a 5% increase over her calculated pre-hire salary. ECF No. 9-2 at 12. Because Holcomb's calculated pre-hire salary of $87,360 exceeded the NIH range of pay for her position classification, her starting annual salary was set at the top of the range, $78,000, along with a one-time signing bonus of $10,000. ECF No. 9-2 at 14. Defendant asserts that the one-time signing bonus was in line with NIH guidelines, which provide that a supplemental non-base pay bonus may be paid "when necessary to recruit or retain an employee who otherwise might not accept or continue employment with the [Clinical Center]," or "when the base pay range is not sufficient or appropriate to meet the candidate/employee's pay requirement." ECF No. 9-2 at 7. These facts are not disputed by Plaintiff.

Plaintiff contends that her seventeen years of non-nursing operating room technician experience was not given adequate consideration, but Defendant maintains that "[q]ualifications for a registered nurse consist of graduating from an accredited nursing program, passing state licensing boards and maintaining current nursing license." ECF No. 9-2 at 19. Non-nursing operating room technician experience does not count towards meeting the qualifications for a nursing position because "one is a registered, licensed position with credentialing privileges and the other is not." ECF No. 9-2 at 30. Accordingly, while Holcomb had less medical experience overall, she had more relevant experience under the qualifications required by Defendant for the position. Thus, Defendant has provided a non-discriminatory reason for the pay disparity.

Plaintiff maintains that Defendant's explanation is merely a pretext for its discriminatory intent. In an attempt to show a pattern of disparate pay practices, Plaintiff makes a number of vague references to the salary, experience, and race of other NIH nurses, but such references are wholly unconvincing. Plaintiff states that Ada Rivera, a Latina nurse with 30 years of nursing

experience, was paid less than Holcomb and received a salary of $74,000. *Id.* ¶ 21. However, Plaintiff provides no reference to Rivera's starting salary, hire date, pre-employment salary, or career progression. In addition, Plaintiff offers salary information for two additional employees that serve to undercut her theory of racial discrimination. Plaintiff states that Theresa Granitto, a white registered nurse that was hired earlier in 2009, had four years of registered nurse experience and received a starting salary of $60,500, which is lower than Plaintiff's salary. ECF No. 1 ¶ 12. Finally, Plaintiff states that Defendant hired Jardin Punzalan[4] as a perioperative nurse in July 2010 and argues that because Punzalan only had non-nursing operating room technician experience, Defendant's failure to count Plaintiff's seventeen years of non-nursing experience was a pretext for racial discrimination. However, in addition to not identifying Punzalan's race, Plaintiff offers no explanation as to how Punzalan's non-nursing experience was used as a substitute for any required nursing experience, and the record indicates that Punzalan's salary in 2010 was $62,085 as compared to Plaintiff's salary of $71,108. ECF No. 11-17 at 2.

Plaintiff also raises a number of objections to the way in which Defendant calculated her pre-hire salary as compared to Holcomb's pre-hire salary, arguing that Defendant's calculated pre-hire salary resulted in a lower level of compensation than Plaintiff was receiving at her former job. However, Plaintiff does not articulate why Defendant's calculation was deficient or what her actual pre-hire salary was. Assuming that Plaintiff objects to Defendant's failure to incorporate her overtime rate into the calculation, such an omission cannot establish a discriminatory intent because Defendant also ignored Holcomb's overtime rate when calculating her pre-hire salary. ECF No. 9-2 at 16 (showing Holcomb's overtime rate as approximately $43.00 per hour).

---

[4] Plaintiff spells this name "Punzalin" in her Complaint, ECF No. 1 ¶ 3, and "Punzulan" in her opposition brief, ECF No. 11-1 at 10, but it is spelled "Punzalan" in the exhibit attached to the brief. ECF No. 11-17 at 2.

Plaintiff also asserts that Holcomb's pre-hire salary was inflated because it did not reflect her decision to forgo employer-sponsored health benefits at her previous place of employment. Plaintiff points to interrogatories from Defendant to suggest that Borostovik knew that Holcomb's pre-hire salary did not include health benefits and requests additional discovery to determine whether Borostovik knew this information at the time he hired Holcomb. ECF No. 11-1 at 3 (citing statement by Borostovik at ECF 11-5 at 9 ("The pay stubs that Karen Holcomb provided to me [Borostovik] do not state if benefits were deducted or not. Karen Holcomb did state in a conversation over the phone that she did not have health insurance benefits deducted from her salary.")). However, even if Borostovik knew that Holcomb's pre-hire salary was inflated because it did not account for health benefits, such facts only suggest that Holcomb may have received a windfall from NIH based on the structuring of her compensation with her prior employer.[5] Even if unfair, Plaintiff has not provided any indication that such a windfall was at all related to race and, thus, evidence of pretext. *See Williams v. Carolina Healthcare System, Inc.*, 452 Fed. Appx. 392, 394 (4th Cir. 2011) ("Title VII does not require fairness or the promotion of the most qualified candidate; it only prohibits discrimination") (internal citation omitted). Further negating an inference of pretext, the record indicates that Plaintiff received a 2.5-5% bonus or raise in July 2010, April 2011, September 2011, and April 2012 as compared to one 2.5% pay raise for Holcomb in April 2011. ECF No. 9-2 at 21.

As such, while Plaintiff alleges that she was treated differently than her white co-worker, in the face of evidence that Defendant had a legitimate non-discriminatory reason for the disparity, Plaintiff cannot present facts to suggest that she was treated unfairly *because of* her race and show that Defendant's stated reason for the disparity was a pretext. *See McCleary-*

---

[5] Defendant maintains that "Plaintiff has presented no evidence that [Holcomb was receiving a higher salary in lieu of health benefits] or that the Agency believed this to be true." ECF No. 9-1 at 12.

*Evans v. Maryland Dept. of Transp. State Highway Admin.*, 780 F.3d 582, 585–86 (4th Cir. 2015) (providing that a Title VII plaintiff must allege facts sufficient to claim that the adverse action was taken "because of the relevant decisionmakers' bias against" race). Thus, summary judgment in favor of Defendant is appropriate regarding Plaintiff's disparate pay discrimination claim.

### ii. Promotion Opportunities

Plaintiff also alleges that "NIH's justification for the disparity [in pay] is pretext for racial discrimination" because the "Defendant does not explain why Ms. Holcomb was chosen over [Plaintiff] for nursing details that increased the likelihood of promotion, even though her superior experience and expertise led to [Plaintiff] being chosen to perform very complex and skilled nursing tasks over Ms. Holcomb." ECF No. 1 ¶¶ 4, 17–19. In addition to providing support for her disparate pay claim, the Court construes this allegation to be a separate claim, alleging discrimination in the form of disparate work assignments and decreased promotion opportunity. However, a discrete discriminatory act, such as non-selection for a promotion, occurs on the day that it happened, and thus, an employee must timely initiate EEO complaint process or lose the ability to recover for the claim. *See Holland*, 487 F.3d at 219–220. Plaintiff has provided no indication that she initiated the EEO complaint process related to this allegation.[6] *See Bryan v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 ("Before a plaintiff has standing to file suit under Title VII, he must exhaust his administrative remedies by filing a charge with the EEOC. The EEOC charge defines the scope of the plaintiff's right to institute a civil suit.") (internal citations omitted). Therefore, Plaintiff failed to exhaust her administrative remedies, and the Court lacks

---

[6] Plaintiff notes that the facts were placed before the Administrative Law Judge ("ALJ") but the ALJ noted this claim of discrimination was a new claim that Plaintiff failed to present to the NIH EEO Office in either her pre-complaint intake form or her formal complaint of discrimination." ECF No. 1-1 at 10.

subject-matter jurisdiction over that claim. *See Hicks v. Balt. Gas & Elec. Co.*, 829 F. Supp. 791, 794–95 (D. Md. 1992), *aff'd*, 998 F.2d 1009 (4th Cir. 1993), *cert. denied*, 510 U.S. 1059 (1994).[7]

### B. Retaliation

Finally, Plaintiff states that "[a]fter complaining about her disparate pay, [Plaintiff] began to experience a hostile work environment." ECF No. 1 ¶ 20. Plaintiff's allegations do not support a claim of hostile work environment and are more appropriately construed as a claim of retaliation.[8] "Title VII's anti-retaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids, or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (citing 42 U.S.C. § 2000e–3(a)). To establish a prima facie case of retaliation, Plaintiff must show that: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) a causal relationship existed between the protected activity and the adverse employment activity. *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

Plaintiff alleges that between her 2012 year-end evaluation, completed on February 28, 2013, and her final performance evaluation, completed on June 10, 2013, Defendant downgraded Plaintiff's performance rating from a 4.6 "to a blank space where lines were drawn through the

---

[7] Even if Plaintiff timely raised this claim, the record does not indicate that Holcomb's selection to the temporary work detail was based on race; rather, it was based on the input received from surgeons, none of whom requested Plaintiff to fill the temporary position. ECF No. 9-2 at 31; *see also Blue v. United States Dep't of the Army*, 914 F.2d 525, 541 (4th Cir. 1990) (preselection for a promotion, even if unfair, does not demonstrate racial discrimination).

[8] To establish a Title VII claim of hostile work environment, Plaintiff must prove that the offending conduct was 1) unwelcome, 2) based on race, 3) sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive environment, and (4) imputable to her employer. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir. 2001). Plaintiff's allegation of a poor evaluation is not the type of conduct considered by courts as satisfying the elements of hostile work environment. *See Jones v. HCA*, 16 F. Supp. 3d 622, 630–31 (E.D. Va. 2014) (finding that negative performance reviews were not sufficient to maintain a hostile work environment claim without any evidence that such reviews were a part of "a pattern of extremely abusive language or otherwise pervasive conduct based on plaintiff's race") (internal quotations omitted).

space" on June 10, 2013. ECF No. 1 ¶ 20.[9] Plaintiff's claim fails because this performance evaluation was not an adverse action—it would not dissuade "a reasonable worker from making a charge of discrimination." *Burlington*, 548 U.S. at 68. First, the record indicates that even though Plaintiff's June 10, 2013 performance evaluation did not include a numerical rating, it stated that "[Plaintiff's] performance at this time meets the successful level," the same comment provided on February 28, 2013. ECF No. 9-2 at 42. The numerical rating was left blank merely because Plaintiff's supervisor, Borostovik, assumed that he did not need to provide a rating since Plaintiff was resigning. ECF No. 9-2 at 46. Once Plaintiff expressed concern, Defendant issued an amended performance evaluation reflecting a numerical rating of 4.6, and backdated the performance evaluation to June 10, 2013. ECF No. 9-2 at 47.

Moreover, Plaintiff's 2012 year-end performance evaluation, which reflected a performance rating of 4.6, was completed on February 28, 2013, well after Plaintiff's supervisors were first aware of her protected activity (*i.e.*, her disparate pay complaint). ECF No. 9-2 at 31 (noting that Plaintiff's supervisors were first made aware of Plaintiff's complaint in May of 2012). Thus, even if her June 10, 2013 performance evaluation could be construed to be an adverse action, it seems unlikely to have been casually related to her protected activity when the rating immediately after the protected activity was positive.

Plaintiff's allegations regarding discrimination based on assignments and reduced opportunities for promotion do not survive summary judgment.

---

[9] Plaintiff also alleges that she was given an "exceptional" rating in 2010 and 2011, but was downgraded to "successful" in 2012 after initiating her disparate pay complaint. ECF No. 11-1 at 5. Plaintiff's 2010 and 2011 performance evaluations include a "Summary Rating" section, where her rating was marked as "Exceptional," the highest of four categories. ECF Nos. 11-10 and 11-11. In 2012, it appears that NIH utilized a different "Summary Rating" format, whereby employees were given a numerical score corresponding to one of five Level Ratings. Plaintiff was awarded a 4.6, which corresponds to a Level 5 "Outstanding Result," the highest level possible. ECF No. 11-12. As such, Plaintiff has no basis to suggest that her performance evaluation was downgraded in 2012.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, ECF No. 9, shall be granted. A separate Order follows.

Dated: November, 9 2017

/s/ 
GEORGE J. HAZEL
United States District Judge